COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

NO. 2-07-045-CR

DANTONIO M. SWANSON APPELLANT

V.

THE STATE OF TEXAS STATE

------------

FROM CRIMINAL DISTRICT COURT NO. 4 OF TARRANT COUNTY

------------

MEMORANDUM OPINION
(footnote: 1)

------------

A jury convicted appellant Dantonio M. Swanson of murder and assessed punishment at 10 years’ confinement.  In a single point, appellant complains that the evidence is legally insufficient to support the jury’s conclusion that he did not act in self-defense.  Specifically, appellant contends that he was justified in using deadly force because he believed the victim had a gun and was about to shoot him.  We affirm. 

 A person commits the offense of murder if he intentionally or knowingly causes the death of an individual, or intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual.
(footnote: 2)  However, a person is justified in using deadly force against another if he reasonably believes that it is necessary to protect himself against the other’s use or attempted use of unlawful force, and a reasonable person in the actor’s situation would not have retreated.
(footnote: 3) 

The defendant has the burden of producing some evidence to support a claim of self-defense.
(footnote: 4) Once the defendant produces that evidence, the State then bears the burden of persuasion to disprove the raised defense.
(footnote: 5)  This burden does not require the State to introduce evidence disproving the defense; rather, it requires only that the State prove its case beyond a reasonable doubt.
(footnote: 6)  When a jury finds the defendant guilty, this is an implicit finding against the defensive theory.
(footnote: 7)
 When reviewing the legal sufficiency of the evidence in the context of the jury’s rejection of a defense, we ask whether, after viewing all the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt and also could have found against appellant on the defensive issue beyond a reasonable doubt.
(footnote: 8)  The issue of self-defense is a fact issue to be determined by the jury, which is free to accept or reject all or part of the defensive evidence.
(footnote: 9)
 The evidence at trial showed that appellant and the victim, Ryan Latigo, had a contentious relationship that had existed for months before the shooting.  In October 2003, Latigo moved into a duplex with Kamiean Kimble, appellant’s ex-girlfriend, and appellant’s young daughter, Karrigan.  Appellant, upset by these living arrangements, often exchanged profanities and threats with Latigo when he went to Kimbell’s duplex to pick up Karrigan.  Appellant also argued with Kimble about Latigo’s presence in the home and once told her that “the only reason that [Latigo] was still living was because [appellant] allowed him to.”

On August 12, 2004, appellant arrived early to pick up Karrigan and began to bicker with Kimble about child support.  The conversation escalated and eventually awoke Latigo, who had been asleep in the bedroom.  Latigo and appellant argued, and both Latigo and Kimble ordered appellant to leave.  Latigo stood in the doorway to watch as appellant, trailed by two-year-old Karrigan, left the duplex.  Both men continued “trash talking” to each other while appellant walked to his car. 

Reaching his car, appellant opened the trunk and pulled out a 12-gauge pump shotgun.  Stepping toward Latigo, appellant told Karrigan, “Baby, move out of the way real quick.”  Appellant fired one shot into Latigo’s chest, piercing all four chambers of his heart and two major arteries.  Latigo stumbled back into the duplex and collapsed on the kitchen floor.  Appellant followed Latigo up to the house to see if the shot had hit him, then took Karrigan and fled.  Kimble dialed 911 to report the shooting.   

After leaving the scene, appellant called his father and told him about the shooting, stating, “I had to shoot him.  He kept coming at me.”  Appellant then drove home to wait for the police.  When an officer arrived, appellant walked out to the patrol car and admitted, “I’m him, I did it.”  Appellant did not mention that he believed Latigo had a weapon or that he shot Latigo in self-defense.  

At trial, appellant testified and raised the issue of self-defense for the first time.  Appellant said that Latigo outweighed him by 60 to 65 pounds and was always the instigator when the men argued.  Latigo wore colors of a local Blood gang, and he and other members of the gang once tried to provoke appellant into a fight.  Appellant said that he never retaliated against or threatened Latigo.

Appellant also said that on a previous occasion, Latigo had physically attacked him.  Appellant claimed that Latigo grabbed him by the throat, pushed him against his car, and threatened to “take [his] punk ass out now.”  Latigo told appellant that he was not afraid to “do time” because he had been in prison before.  Appellant believed that Latigo was going to kill him and remained afraid every time he went to pick up his child.  Appellant did not call the police after this incident because he feared that Latigo or members of the Blood gang might retaliate.  Appellant testified that he instead bought a shotgun for protection, which he carried, loaded, in the trunk of his car. 

On appeal, appellant argues that no rational jury could have found him guilty of murder because he testified, without contradiction, that he believed the victim had a gun in his hand.  Appellant said that on the day of the shooting, Latigo had followed him out of Kimble’s apartment, shouting that he would “beat [appellant’s] brains out” and “end this shit right now.“  Latigo then reached behind his back, which made appellant believe that Latigo had a weapon.  Appellant testified that he saw a “shiny metal object” in Latigo’s hand and believed Latigo was “going to do something to [him].”

Although appellant claims that he was reasonably in fear for his life, the evidence was legally sufficient for the jury to conclude otherwise.  Evidence at trial showed that Latigo was standing at least 25 feet away when appellant pulled the gun out of his car trunk.  Appellant, rather than retreating, stepped toward Latigo and instructed his two-year-old daughter to get out of the way.  Appellant had only one cartridge in the gun, which he shot at Latigo.  Without ammunition to reload, and not knowing whether his shot hit Latigo or if Latigo was still holding the object appellant believed was a gun, appellant followed Latigo to the house.  The jury could have rationally concluded that these actions were inconsistent with those of a man in fear for his life. Thus, based on appellant’s own testimony, the jury could have determined that appellant was not reasonably afraid for his life and that deadly force was not immediately necessary for appellant to defend himself. 

Other testimony supported the jury’s rejection of appellant’s defense.  Although Appellant claimed that he had to defend himself because Latigo “kept coming at him,” Kimble testified that she was pulling Latigo back into the house when appellant shot him.  She also said that Latigo’s hands were relaxed at his sides, and not tensed or flexed as if he was reaching for something.  Kimble did not allow Latigo to keep a gun in her house, and investigating officers did not find any weapons at the scene of the shooting.  Based on this record, the jury acted within its province in accepting Kimble’s testimony as true and in rejecting appellant’s version of events. 

Finally, appellant undermined his self-defense claim by repeatedly contradicting himself.  For example, during an interview shortly after his arrest, appellant told police that he had only intended to frighten Latigo with the gun, but it “accidently fired.”  At trial, however, appellant testified that he shot Latigo to protect himself because Latigo “kept coming at him.”  Appellant later claimed on cross-examination that he did not intend to harm Latigo, but had merely fired the gun to “scare him off.”  Given the inconsistency of appellant’s statements, coupled with his failure to mention the self-defense claim until trial, the jury could have found his testimony to be not credible.

While there is some evidence in the record supporting appellant’s self-defense allegations, there is also evidence from which a rational jury could have dismissed appellant’s defensive claim.  After carefully considering the evidence and applying the appropriate standard of review, we conclude that the evidence is legally sufficient to prove the essential elements of murder beyond a reasonable doubt and to support the jury’s rejection of appellant’s defensive theory.  

Appellant’s point is overruled, and we affirm the trial court’s judgment.

PER CURIAM

PANEL F:  CAYCE, C.J.; GARDNER and WALKER, JJ.

DO NOT PUBLISH 

Tex. R. App. P.
 47.2(b)

DELIVERED:  February 7, 2008 
 

FOOTNOTES
1:
See 
Tex. R. App. P.
 47.4.

2:
Tex. Penal Code Ann
. § 19.02(b)(1),(2) (Vernon 2003).
  

3:
Id. 
§§ 9.02, 9.31, 9.32 (Vernon 2003). Although sections 9.31 and 9.32 have since been amended, the offense for which appellant was convicted occurred before the effective date of the amendments (September 1, 2007) and, therefore, is governed by the previous version of these statutes.  
See
 Act of March 21, 2007, 80th Leg., R.S., ch. 1, §§ 5, 6, 2007 Tex. Gen. Laws 1, 2 (codified as an amendment of 
Tex. Penal Code Ann.
 §§ 9.01, 9.31, 9.32 and 
Tex. Civ. Prac. & Rem. Code Ann.
 § 83.001). 

4:
Zuliani v. State
, 97 S.W.3d 589, 594 (Tex. Crim. App. 2003);
 Saxton v. State
, 804 S.W.2d 910, 913–14 (Tex. Crim. App. 1991).

5:
Zuliani
, 97 S.W.3d at 594; 
Saxton
, 804 S.W.2d at 913–14; 
Dotson v. State
, 146 S.W.3d 285, 291 (Tex. App.—Fort Worth 2004, pet. ref’d).

6:
Zuliani
, 97 S.W.3d at 594; 
Saxton
, 804 S.W.2d at 913; 
Dotson
, 146 S.W.3d at 291.

7:
Zuliani
, 97 S.W.3d at 594; 
Saxton
, 804 S.W.2d at 914.

8:
Saxton
, 804 S.W.2d at 913; 
Dotson
, 146 S.W.3d at 291.

9:
Saxton
, 804 S.W.2d at 913–14; 
Dotson
, 146 S.W.3d at 295.